UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ILLINOIS CENTRAL RAILROAD COMPANY,<br><br>  Plaintiff,<br><br>v.<br><br>MICHAEL BELCHER,<br><br>  Defendant. | CAUSE NO. 3:22-CV-888 DRL-MGG |

## TEMPORARY RESTRAINING ORDER

Illinois Central Railroad Company (ICRC) filed a complaint and motion for a temporary restraining order against Michael Belcher. The court held a hearing on October 25, 2022. Mr. Belcher appeared *pro se* after receiving notice of the filings and hearing. He had attempted but not yet retained counsel. He submitted five exhibits. ICRC appeared by counsel. The company tendered seven exhibits as well as the declarations of Jean-Francois Bourdeau and Emily Connor. After hearing from the parties, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Michael Belcher was employed at ICRC from 2002 until his termination on October 19, 2022. He eventually became a senior manager. Around 2012, he began working with ICRC's finance department.

2. As a senior manager, Mr. Belcher participated in ICRC's share units plan (PSU Plan) and was awarded performance share units (PSUs). Each time he was awarded PSUs, he received an award letter containing the following provision:

> During the course of the Participant's employment with the Company, the Participant will have had access to and will have been entrusted with confidential information relating to the Company, its customers, suppliers and employees (the "Confidential Information"), the particulars of which, if disclosed to competitors of the Company or to the general public, could be detrimental to the best interests of the Company.

> The Confidential Information is the exclusive property of the Company, and while employed by the Company and at all times thereafter, the Participant will not, without the prior written consent of the Company, (a) reveal, disclose or make known any Confidential Information to any person, or (b) use the Confidential Information for any purpose, other than for the purpose of the Participant performing his or her duties for the Company.

3. Most recently, Mr. Belcher was awarded and accepted PSUs with award letters containing this provision in January 2019, January 2020, and January 2022.

4. Mr. Belcher received regular training on the ICRC Code of Business Conduct. Although the record remains soft on whether Mr. Belcher acknowledged this Code of Business Conduct in writing or through some signed document, he nevertheless was aware of this term:

> CN owns the intellectual property that employees, contractors and agents create while working for CN or using CN resources, regardless of whether such intellectual property has been created on CN's premises or outside of regular work hours. If you create, discover, or develop methods, processes, systems, improvements, designs, ideas, technologies or other patentable inventions, you must promptly disclose them to the CN Law Department and maintain accurate records as CN may want to protect them with, for example, patents or industrial designs. You should also do everything that is requested by CN (at the expense and on behalf of CN) in order to obtain, establish, preserve and protect CN's rights in its intellectual property, including preparing and signing applications and other documents.[1]

5. The Code of Business Conduct also stated, "You agree that all such intellectual property is owned by CN and agree to transfer or assign ownership to CN and waive any moral rights in [favor] of CN."

6. In 2013, Mr. Belcher created applications and systems, including "PMA," to assist with the financial analysis and regulatory compliance work he was assigned to do. Although the parties dispute whether he was assigned these tasks as part of his job duties, the record demonstrates that he created these applications and systems with ICRC property and on company time, and that numerous ICRC employees used them to complete their job tasks, not just Mr. Belcher.

---

[1] Canadian National Railway (CN) is the parent company of ICRC.

7. ICRC used these systems for forecasting, budgeting, completing financial reporting and regulatory compliance, and running various reports for interdepartmental functionality.

8. In late September 2022, ICRC began an investigation into Mr. Belcher for conduct entirely unrelated to this lawsuit.

9. On October 17, 2022, as this investigation neared its hammer stroke, Mr. Belcher sent an email to his manager stating that he is "no longer allowing the use of [his] intellectual properties without fair market compensation," that ICRC's "finance systems are no longer functioning," and that he expected a "reasonable offer for compensation in this matter." He said, "the longer this take[s] the higher the price," and that if offered "something offensive the higher the price."

10. ICRC immediately investigated its systems and discovered that the company seem disabled from using the applications and systems Mr. Belcher created.

11. On October 19, 2022, ICRC sent Mr. Belcher a letter via email terminating his employment and demanding that Mr. Belcher return company property and restore access to ICRC's systems.

12. In addition, Mr. Belcher posted on LinkedIn an internal manual for the "PMA" application he designed. Mr. Belcher's post included information about the organization and function of ICRC's systems, vendor relationships, invoice numbers, and employee salaries. ICRC kept this manual confidential and did not allow public access.

13. ICRC has attempted to restore access to these systems and applications. Some of the applications have been partially restored but some are still completely inaccessible. None of the applications and systems have been completely restored.

14. ICRC has made a sufficient showing that Mr. Belcher gained access to the company's confidential trade secret information, including without limitation its engineering dashboard and related applications (including PMA), its web reports, SQL server and ETL processes.

15. ICRC has made a sufficient showing that Mr. Belcher, through at minimum his departure and retention or control of the source code and pin number, disabled or caused to be disabled the company's internal systems and applications, including without limitation PMA, in likely violation of state and federal law, including trade secrets laws, contract, and trespass to chattels.

16. On this preliminary record, Mr. Belcher published ICRC's confidential information on LinkedIn in likely breach of his contractual obligations and state and federal trade secret laws.

17. ICRC today believes that acquisition of the source code and pin number will reinstate its access and functionality of its systems. The company has not made a sufficient showing that more than this is required to do so. Mr. Belcher advised on the record today where the source code and pin number could be found, and this order will require his return of all such versions of this information. Should the company need more, it will need to apply specifically for this relief and meet its burden of seeking a mandatory injunction in that precise measure, and be prepared to explain why the retention of the services of a knowledgeable programmer to replicate the expertise that Mr. Belcher provided the company would not otherwise address its concerns.

18. Mr. Belcher represented himself well at the hearing today. He was also responsive to questions, which the court appreciates. The court believes that Mr. Belcher endeavored to provide candid answers and information today. He was dismayed by how the company has treated him and for not allegedly compensating him for the systems he designed to ease his and his colleagues' work at the company. As a father of six children, he continues to look for other employment.

19. To his credit, Mr. Belcher has already returned certain information to ICRC's parent company, including the computer where he apparently stored the source code. He said that he was willing to return the other property but had not received a prepaid shipping box from the company to return it.

CONCLUSIONS OF LAW

1. For a temporary restraining order, a plaintiff must show that (1) "it has some likelihood of prevailing on the merits of its claims," (2) "without this relief, it will suffer 'irreparable harm,'" and (3) "'traditional legal remedies would be inadequate.'" *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020) (quoting *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)). If a plaintiff makes such a showing, the court proceeds to a balancing analysis, to determine whether the balance of harm favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's interests. *Id.* This balancing process involves a sliding scale approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

2. On the first prong, "the applicant need not show that [it] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). "A plaintiff must demonstrate that its claim has some likelihood of success on the merits, not merely a better than negligible chance." *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (quotations and citation omitted). In other words, "a mere possibility of success is not enough." *Pritzker*, 973 F.3d at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotation marks omitted). The precise showing necessary "depends on the facts of the case at hand because of [the] sliding scale approach." *Mays*, 974 F.3d at 822.

3. In assessing the merits, the court does not simply "accept [the plaintiff's] allegations as true, nor do[es] [it] give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, the court must assess the merits as "they are likely to be decided after more complete discovery and litigation." *Id.* "A 'strong' showing thus does not mean proof by a preponderance—once again, that would spill too far into the ultimate merits for something designed

5

to protect both the parties and the process while the case is pending." *Pritzker*, 973 F.3d at 763. Rather, it includes "a demonstration of how the applicant proposes to prove the key elements of its case"—noting this plays only one part in the analysis. *Id.*

4. As to the second prong, "[i]ssuing a [temporary restraining order] based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). A finding of irreparable harm absent an injunction "is a threshold requirement" for granting a temporary restraining order. *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). This requires more than a mere possibility of harm. *Michigan v. United States Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). It does not, however, require that the harm occur or be certain to occur before injunctive relief is warranted. *Id.* Rather, harm is considered irreparable if it "cannot be prevented or fully rectified by the final judgment after trial." *Girl Scouts of Manitou Council, Inc. v. Girls Scouts of the U.S. of America, Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)) (quotation marks omitted).

5. "A legal rule that irreparable injury can be established only by a concrete demonstration along the lines of 'we lost the Philadelphia advertising business of Warner Bros. to THA as a result of Owens's work for our rival' would make injunctions useless as a practical matter." *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005). "[I]t is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'" *Id.* "[I]t is well established that the loss of goodwill and reputation, if proven, can constitute irreparable harm." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) (citing *Life Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012) and 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2948.1 (3d ed. 2002 & April 2021 Supp.) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable.")). "[A]lthough

economic losses generally will not sustain [an] injunction, there are exceptions where, as here, a remedy may come 'too late to save plaintiff's business.'" *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994).

6. The third prong requires the moving party to demonstrate that it has no adequate remedy at law should the injunction not issue. *Protamek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002). This does not require that the plaintiff demonstrate that the remedy be wholly ineffectual. *Foodcomm Int'l*, 328 F.3d at 304. Rather, a party must demonstrate that any award would be "seriously deficient as compared to the harm suffered." *Id.*

7. Once a moving party has met its burden of establishing the threshold requirements for a injunction, the court must balance the harms faced by both parties and the public as a whole. *See Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1100; *see also Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). This is done on a sliding scale measuring the balance of harms against the moving party's likelihood of success. *Turnell*, 796 F.3d at 662. The more likely the party is to succeed on the merits, the less the scale must tip in his favor. *Id.* The converse, however, also is true: the less likely the party is to win, the more the balance of harms must weigh in the party's favor for an injunction to issue. *Id.*

8. The "balance of hardships—takes on heightened importance when the plaintiff requests a 'mandatory injunction,' that is, an injunction requiring the defendant to perform an affirmative act." *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011). Mandatory injunctions are "ordinarily cautiously viewed and sparingly issued." *Mays*, 974 F.3d at 818 (quoting *Graham v. Medical Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997)); *see also Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) (review of an injunction is "even more searching" when the injunction is "mandatory rather than prohibitory in nature"). A mandatory injunction "imposes significant burdens on the defendant and requires careful consideration of the intrusiveness of the ordered act, as well as

the difficulties that may be encountered in supervising the enjoined party's compliance with the court's order." *Kartman*, 634 F.3d at 892.

9. ICRC demonstrated through a strong showing that its claims—misappropriation under Indiana's Uniform Trade Secrets Act and the Defend Trade Secrets Act, breach of contract, civil conversion, and trespass to chattels—have some likelihood of success on the merits. This isn't to say ICRC will prevail on its claims, only that it has shown some likelihood of success.

10. ICRC demonstrated irreparable harm by more than a mere possibility and in the form of lost goodwill, reputation harm, and regulatory noncompliance. "[I]t is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable,'" *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005), and "it is well established that the loss of goodwill and reputation, if proven, can constitute irreparable harm," *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) (citations omitted). Indeed, Mr. Belcher recognized that requiring ICRC to return to the pre-2013 way of managing its business would prove "cumbersome."

11. ICRC demonstrated that it has no adequate remedy at law should the injunction not issue. Although certain harm might be recompensed through money damages, not all on this preliminary record could be.

12. The irreparable harm to ICRC outweighs the harm that Mr. Belcher will suffer with this temporary restraining order. The burden on Mr. Belcher is quite modest in that it requires little more of him than what he has said on the record he is already willing to do, or already has done. The harm to ICRC and its operations, on this preliminary record, is great. The public, which has an interest in the protection of trade secrets and ongoing operations of major railroad thoroughfares, also will be served by this temporary restraining order.

13. A temporary restraining order is appropriate today, albeit not in all respects requested by ICRC.

Accordingly, the court GRANTS the motion for a temporary restraining order [ECF 3] and ORDERS Mr. Belcher to do the following immediately:

1. Return to ICRC all source code, files, materials related to the company's financial systems, and any other ICRC documents and materials, including without limitation any electronic copies of source code for any ICRC applications that exist on any external hard drive and any hard copies that might exist.

2. Return ICRC's laptop, cellphone, access card, and any other ICRC property to ICRC, along with any passwords or other information needed to access this property.

3. Refrain from accessing, retaining, disclosing, or using ICRC's trade secrets and confidential information, including without limitation its files, source code, and any other such protectible materials.

4. Remove any public posting of documents containing ICRC's trade secret and confidential information, including the ICRC confidential information currently posted on his LinkedIn page.

5. Preserve, and not destroy or otherwise alter, all paper and electronic records that concern or relate to ICRC.

6. Submit computers utilized in the performance of his employment with ICRC, and any accounts, devices, and storage locations used during his employment or as part of his actions in creating, storing, or removing ICRC property (including PMA and its source code) or utilizing or disabling the company's systems for forensic inspection conducted by ICRC's forensic professionals to review and confirm deletion of all materials.

Unless and until Mr. Belcher retains counsel, any inspection of his personal computer or devices will be permitted only upon ICRC's written application for the same to the court supported by a protocol that will ensure the protection of private information.

On or before November 7, 2022, Mr. Belcher must file with the court, in writing and under oath, a signed statement (a) that he has returned all ICRC property in his possession, custody, or control to ICRC, (b) that he no longer possesses any ICRC property, (c) that he has removed from any public locations, including LinkedIn, any ICRC trade secrets or other confidential information, and (d) identifying any other site to which or third-party to whom he disclosed ICRC's trade secret or other confidential information.

The court cautions the parties, including Mr. Belcher, that the failure to comply with this order could result in additional sanctions, including without limitation a finding that a party should be held in contempt of court.

ICRC must post a bond in the amount of $2,500.00 as security by October 27, 2022. The request for attorney fees and costs will be entertained only by a separate motion.

This temporary restraining order will terminate on November 8, 2022 at 4:00 p.m., unless extended by the court under Federal Rule of Civil Procedure 65(b). Any application for a preliminary injunction must be made by ICRC hereafter, given the relief already afforded by the court.

Any motion to seal any portion of the transcript from today's hearing must be filed by November 1, 2022.

SO ORDERED.

October 25, 2022            *s/ Damon R. Leichty*
                                                           Judge, United States District Court